**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 0 6 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

MURRAY LAWRENCE,

        Defendant.

**JUDGMENT, MEMORANDUM,
AND ORDER ON
SENTENCING**

16-CR-243

**Appearances**

<u>**United States**</u>

**Allon Lifshitz**
**Mathew Scott Miller**
**Rena Paul**
U.S. Attorney's Office, E.D.N.Y.
271 Cadman Plaza East
Brooklyn, NY 11201

<u>**Defendant**</u>

**Samuel Jacobson**
Federal Defenders of New York
One Pierrepont Plaza
16th floor
Brooklyn, NY 11201

**JACK B. WEINSTEIN, Senior United States District Judge:**

| | | |
|---|---|---|
| I. | Background | 1 |
| | A. General Deterrence | 2 |
| | B. Community Effect | 9 |
| | C. Specific Deterrence | 9 |
| | D. Characteristics of Defendant | 10 |
| | E. Conclusion | 11 |
| II. | Facts | 12 |
| | A. Background of Defendant | 12 |
| | B. State Incarceration | 13 |
| | C. Instant Offense | 14 |
| | D. Arrest | 15 |
| | E. Guilty Plea | 15 |
| | F. Sentencing Hearing | 15 |
| III. | Offense Level, Category, and Sentencing Guidelines Range | 16 |
| IV. | Law | 17 |
| | A. Sentencing Commission Guidelines | 17 |
| | B. Sentencing Considerations | 18 |
| | 1. 18 U.S.C. § 3553(a) | 18 |
| | 2. Suicide | 18 |
| | 3. Gang Membership | 21 |
| V. | Conclusion | 23 |
| VI. | Recommendation to Sentencing Commission on Gang Membership | 24 |

## I.    Background

Defendant in the instant case pled guilty to a serious crime.  He is either a gang member or on the verge of becoming one.  He recklessly fired an illegally possessed handgun repeatedly down a public street, with the likelihood that a passing pedestrian might be hit: in fact he wounded his companion.

This case presents some of the critical difficulties in federal sentencing. It requires balancing general deterrence (and, relatedly, incapacitation) by a relatively long prison term with specific deterrence (and its other aspect, rehabilitation) by a relatively short term in prison. Both must be considered under section 3553(a)(2)(B) of section 28 of the United States Code. By compromising, and reducing a somewhat draconian sentence (possibly less effective for general deterrence), or increasing the sentence (possibly less effective for rehabilitation), the sentence may risk frustrating either goal.

The subtle weighing of alternatives is made more difficult by the presence of numerous competing vectors (such as family or work or criminal history). In the present case the court accepted, and acted on, testimony of an expert witness that increasing the length of incarceration does not proportionally increase general or specific deterrence.

### A.    General Deterrence

The theory of general deterrence is that imposing a penalty on one person will demonstrate to others the costs of committing a crime, thus discouraging criminal behavior. The prevailing argument is that in order to treat a defendant such as the present one, who recklessly fired a gun on an urban street, as an exemplar for others who need to be deterred from carrying and using guns, a long prison term is required.

New York City has strict gun control and licensing requirements. The large number of guns brought into the City from other states where legal control of guns is minimal poses a serious problem in general deterrence.

A recent study examined the purchase history of the nearly 53,000 crime guns recovered by law enforcement in New York between 2010 and 2015. It concluded that 74 percent of all guns connected to a crime and recovered by law enforcement originated out-of-state, and 86 percent of

recovered handguns came from out-of-state. OFFICE OF THE ATTORNEY GENERAL ERIC T. SCHNEIDERMAN, TARGET ON TRAFFICKING: NEW YORK CRIME GUN ANALYSIS (2017), https://targettrafficking.ag.ny.gov/#toppart; *see also* Barack Obama, *The President's Role in Advancing Criminal Justice Reform*, 130 HAR. L. REV. 811, 856-58 (2017) (addressing the "epidemic" of killings resulting from gun violence in the United States).

In connection with the gun problem, the court must consider gang control. Induction of new members often results in killing, either as an element of gang warfare or as a kind of initiation.

Imposing a long sentence in a case where a defendant possessed an illegal gun and ammunition may deter those importing shipments of illegal guns into the state and selling them on the streets of New York City. Arguably it will deter the illegal purchase and use of guns, especially by gang members: a long sentence warns members of the community that being caught and prosecuted for carrying an illegal gun will result in a substantial term in prison – and intuitively, the longer the sentence, the more effective the deterrence.

Professor Jeffrey Fagan, Ph.D. provided expert testimony challenging the assumption that a longer term of incarceration will necessarily have a general deterrent effect on future gun crimes. *See* Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.); Hr'g Tr., Feb. 28, 2017 ("Feb. 28 Hr'g Tr."). Dr. Fagan is the Isidor and Seville Sulzbacher Professor of Law at Columbia Law School and a Professor in the Department of Epidemiology at the Mailman School of Public Health at Columbia University. Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 1. He has extraordinary qualifications as a leader in the fields of criminology and mental health, with a large number of peer-reviewed publications in sociology and criminology. This expert for the defendant concluded – without contradiction from a government expert – that, although general deterrence is one of the essential

justifications for criminal punishment, the deterrent effect of criminal sanctions for gun violence are specific to the risks of detection, not to the severity of punishments. *Id.*; Feb. 28 Hr'g Tr.

He explained that "[a] 'rational offender' will decide whether or not to commit a crime by weighing the benefit of not committing a crime with the benefit of committing the crime without being caught and the benefit of committing a crime that results in being caught and punished." Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 4.

A decision not to commit the crime requires knowledge by the would-be offender of the law prohibiting the act, the risks of detection, and the risks of punishment; it assumes that each potential offender is capable of rationally weighing the costs and benefits of a decision. *Id.*

> [Defense Counsel] Can you describe for the Court the rational offender economic approach to deterrence?
>
> [Witness] Deterrence relies very heavily on rational offenders, and the assumption is that they will make an accurate perception and calculation of those costs. They would engage in an accurate decision-making process that rationally weighs those costs, costs of punishment against benefits of doing the crime. They will arrive at a net cost benefit calculation that would persuade them not to engage in the crime.

Feb. 28 Hr'g Tr. at 11:21-12:4.

Many offenders do not act rationally. Whether they can calculate the consequences of their actions depends on a variety of factors, including the type of offense and the offender's age, emotional maturity, level of education, and experience with decisionmaking. *Id.* at 46:14-50:12.

> [Defense counsel] Is there an issue both with the knowledge that the rational offender has about the repercussions as well as whether someone is a rational offender to begin with?
>
> [Witness] Yes. There is very little data to show the rationality of an offender in making these kinds of calculations . . . on the spot when one is considering doing a crime. Of course, you can imagine doing the difficulty of doing that kind of research. There have been simulations of it in laboratories under varying conditions, and they generally seem to think that the costs of punishment are much less salient to deterrence than other risks of possibility of detection and of the length of punishment. . . . I think . . . a very strong consensus in the theoretical and

4

empirical literature on this relies on the perceptions of the risks of apprehension, and the risk of detection. Less so than the risk of punishment, and certainly, not on the costs of punishment.

Feb. 28 Hr'g Tr. at 14:25-15:17.

Professor Fagan concluded that there is no reliable evidence that appreciably longer periods of incarceration for violent crimes have a general deterrent effect on the population. *Id.* at 50:10-12; Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 6-8.

> [Defense Counsel] And is there a consensus, according to your research, as to the empirical studies on the effectiveness of general deterrence?
>
> [Witness] Most of the studies agree that there is very little deterrent effect associated with lengthy costs of punishment. That if there is a deterrent effect from criminal justice activity, from enforcement activity, it's in raising the risk of apprehension. . . . But the consensus of the literature is that deterrence effects really stop there; that lengthy sentences don't add much to the cost benefit calculation. Most offenders have a hard time seeing, really, the difference between 3 years, 5 years, 10 years, or 20 years [of incarceration].

Feb 28 Hr'g Tr. at 12:5-19.

For gun crimes there is little reliable evidence "of a general deterrent effect of lengthy sentencing enhancements that impose additional years of incarceration for crimes committed with a firearm." Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 8-12 (citing in support: Steven Raphael & Jens Ludwig, *Prison Sentence Enhancements: The Case of Project Exile, in* EVALUATING GUN POLICY 251 (Jens Ludwig & Philip J. Cook, eds., 2003); Richard Rosenfeld, Robert Fornango & Eric Baumer, *Did* Ceasefire, Compstat, *and* Exile *Reduce Homicide?*, 4 CRIMINOLOGY & PUB. POL'Y 419 (2005); Colin Loftin & David McDowall, *"One with a Gun Gets You Two": Mandatory Sentencing and Firearms Violence in Detroit*, 455 ANNALS AM. ACAD. POL. & SOC. SCI. 150 (1981); Colin Loftin, Milton Heumann & David McDowall, *Mandatory Sentencing and Firearms Violence: Evaluating an Alternative to Gun Control*, 17 L. & SOC'Y REV. 287 (1983); Colin Loftin & David McDowall, *The Deterrent Effects of the Florida Felony Firearm*

*Law*, 75 J. CRIM. L. & CRIMINOLOGY 250 (1984); David McDowall, Colin Loftin & B. Wiersema, *A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crime*, 83 J. CRIM. L. & CRIMINOLOGY 378 (1992); John J. Donohue III, *Assessing the Relative Benefits of Incarceration: Overall Changes and the Benefits on the Margin, in* DO PRISONS MAKE US SAFER? THE BENEFITS AND COSTS OF THE PRISON BOOM 269 (Steven Raphael & Michael Stoll eds., 2009); Thomas A. Loughran, Edward P. Mulvey, Carol A. Schubert, Jeffrey Fagan, Alex R. Piquero & Sandra H. Losoya, *Estimating a Dose-Response Relationship Between Length of Stay and Future Recidivism in Serious Juvenile Offenders*, 47 CRIMINOLOGY 699 (2009)); *see also* Feb. 28 Hr'g Tr. at 12:21-14:23.

Degree of certainty – as opposed to the length and severity – of punishment provides the strongest general deterrence effect. Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 12; *see generally* Feb. 28 Hr'g Tr. "People are *more motivated* by the probability of being caught than by the severity of the punishment . . . increased sanctions do not substantially reduce future recidivism but instead produce only a small deterrent or incapacitation effect on recidivism." Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 7 (internal quotation marks, citations, and footnotes omitted). Professor Fagan could not conclude that "people who were engaged or thinking about the possibility of engaging in violence [would] be affected by the difference in [the length of] sentences." Feb. 28 Hr'g Tr. at 42:23-43:18.

Applying his theory to defendant's case, the expert suggested that "[b]ecause the strongest general deterrent effect derives from the certainty as opposed to severity of punishment, any additional term of incarceration beyond what Mr. Lawrence has already served will provide little if any marginal effect on the deterrence of gun crimes by other individuals in the community." Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 12.

[Defense counsel] And applying the studies and your research on general deterrence . . . what are some of the factors that make it difficult to be a rational offender, specifically, with regards to the federal offense that Mr. Lawrence is charged with?

[Witness] Well, one would be knowledge of what the sentencing regime would be. I don't know that there's any way for a person in a community contemplating the possibility of a crime to know . . . what the risks of the case would be . . . . There's no way of that knowledge to be disseminated through a community.

. . .

[Defense counsel] And one of the factors that you just mentioned is that there's a great deal of uncertainty about where an individual would be prosecuted; is that right?

[Witness] They have no idea whether a case is going to be [prosecuted] if they're caught. . . . [T]hey have no way of estimating whether that case is going to be tried in federal court with a longer [sentence under a federal statute], or in a state court with a somewhat shorter sentence.

. . .

[Defense counsel] Within a particular regime like the federal regime . . . a future offender[ ] would have to know how the [sentencing] guidelines worked, for example; is that right?

[Witness] Yes, they would have to know what the risk . . . of detection would be. . . . In other words, the rate of which offenders are arrested relative to the number of crimes that are done. Then they would have to get some sense of the risk of being . . . convicted of the crime for which they are arrested. We often know that there are plea bargains. And then they would have to know what the sentencing risks would be. In other words, they have to know what the punishment is that they could expect and that information is just not widely shared or widely communicated. And even if it is communicated, I'm not sure that it's communicated accurately[.]

. . .

[Defense counsel] And based on what you've discussed in your research and your review of the empirical literature, do you have a conclusion about how all of these factors affect Mr. Lawrence's case?

[Witness] I think it's unlikely [for] Mr. Lawrence . . . under the theory of specific deterrence[ ] or in general for people in the . . . community in which Mr. Lawrence lives, that being given . . . an enhanced sentence, under the federal guidelines, under federal statute, would have much of a deterrent effect either for him or in general in the community. Only were there to be extraordinary measures to disseminate

that information would there be the possibility of deterrence. But all of the research that we've done including on gun crimes suggest that even where there's knowledge of lengthy sentences that's not the key to deterrence. The key to deterrence is the risk of punishment.

Feb. 28 Hr'g Tr. at 15:23-19:16.

To be effectively deterred by a sentence in the instant case, future possible offenders would have to have some idea of what sentence was ultimately imposed on Mr. Lawrence, appreciate the likelihood of detection and of the federal sentencing guidelines, and engage in a rational cost-benefit analysis. This process is unlikely. Part of the problem is that adolescents like the present defendant think – with considerable accuracy – that they will never be caught.

The court must consider the fact it has observed in many sentences, that a large number of young men in high-crime neighborhoods carry guns for what they say is self-protection. Few of them are old enough or have had the benefit of enough education or life experience to have developed the capacity to weigh the costs and benefits of carrying an illegal weapon. Imposing on prospective defendants such as the one in the instant case a long sentence would not help them develop this skill. Even assuming that future offenders could engage in rational decisionmaking, the research cited by Professor Fagan "does not suggest that the cost-benefit analysis would be responsive to the punishment imposed in Mr. Lawrence's case." Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.), at 12.

The sentence must therefore be long enough to encourage anyone who is able to weigh the costs of such actions to avoid possession of a gun, and to adequately incapacitate Mr. Lawrence to the extent necessary. But, imposing a long incarcerative sentence on him in order to deter future gun violence by members of the community seems futile.

8

## B.  Community Effect

To be taken into account is the effect a long sentence will have on the community.  A prison sentence is partly intended to make a community safer and to remove the danger a defendant poses to the people around him or her while incarcerated and after release through specific deterrence. Young defendants are eventually released from prison.  If they are hardened as criminals during their incarceration, they will pose a greater danger to their community when they get out.  Some prosecutors have recognized this difficult balance.  Considering an alternative to incarceration – releasing a defendant on probation to receive mental health services – a state's attorney recently explained, "[t]he rationale for me became, 'What makes people safer over the long term?' . . . Is it treatment or just getting [the defendant] off the street?"  C.J. Chivers, *The Fighter*, N.Y. TIMES MAG., Jan. 2017, at 53.

Another vector is the cost to a defendant's community of long-term imprisonment: defendants are usually incapable of making substantial contributions to their communities and families while they are incarcerated and after a long sentence has been served.  The large number of people who come from deprived communities and are imprisoned, and their absence while in prison, has a disastrous political, social, and economic effect on their communities and on the families they come from or missed having.

## C.  Specific Deterrence

A sentencing court must consider whether a sentence will achieve specific deterrence and persuade defendant to resist further criminal behavior.  Offenders are generally thought to be more effectively deterred from future criminal conduct if they receive swift, certain, and severe punishment.

But, according to Professor Fagan, a long sentence will not achieve specific deterrence for the same reasons that it would not deter future gun crimes in the community. *See generally* Def.'s Ex. B (Report of Jeffrey Fagan. Ph.D.). The key to both general and specific deterrence is the known risk of detection and punishment, not the length of the sentence. Feb. 28 Hr'g Tr. at 19:3-16. The fact that defendant was apprehended and has already served a term of incarceration will provide more specific deterrence than would any additional term of incarceration. *Id.*

### D. Characteristics of Defendant

Sentencing considerations are more difficult to evaluate when a defendant is mentally or physically disabled and requires treatment that is not available to the same extent in prison as while under supervised release in the community. In the instant case, defendant attempted suicide while he was incarcerated on a different charge.

The court must take into account the fact that a long prison term increases the danger to the prisoner while he is in prison. In view of his attempted suicide, it is likely that this defendant will be placed in solitary confinement for a considerable portion of his sentence. This experience is likely to increase the risk of his becoming more depressed than he is now, further increasing the risk of suicide in prison or after release. A shorter sentence is likely to have a less pernicious effect on him. Mental health treatment available outside of prison, under the supervision of probation, would probably be more beneficial to him personally, and to the community, than a long prison term.

The compassion and empathy due a defendant denied an appropriate middle-class upbringing and education should in theory have no effect in calculating deterrence elements. But they do. Many of the difficulties of young men before us are based on failures of society to provide adequate help, or may be artifacts of societal discrimination carried over from generation to

generation. In sentencing, the court looks across to a human being and his mother and siblings who suffer from the sentence.

### E. Conclusion

The Sentencing Commission provides some assistance in uniformity of sentencing. An imprisonment range of 41 to 51 months is recommended by the Guidelines in the instant case, and the statutory maximum term of imprisonment is 10 years. A large part of a district court judge's role in the criminal justice system is taking into account the considerations outlined in part above, and their impact on the community.

Each defendant before the court is entitled to be treated as an individual human being. *G.M.M. ex rel. Hernandez-Adams v. Kimpson*, 116 F. Supp. 3d 126, 152 (E.D.N.Y. 2015) (emphasizing the importance of "the myriad factors affecting an individual's capacity to fulfill his or her potential"); CHIEF JUSTICE JOHN G. ROBERTS JR., 2016 YEAR-END REPORT ON THE FEDERAL JUDICIARY 5 (2016) ("Most district judges agree that sentencing is their most difficult duty. . . . In delivering the sentence, the judge speaks as the voice of the community.").

> [T]hose entrusted with influence over the direction of the criminal justice system must also remember that reform is about more than the dollars we spend and the data we collect. How we treat those who have made mistakes speaks to who we are as a society and is a statement about our values – about our dedication to fairness, equality, and justice and about how to protect our families and communities from harm, heal after loss and trauma, and lift back up those among us who have earned a chance at redemption.

Barack Obama, *The President's Role in Advancing Criminal Justice Reform*, 130 HAR. L. REV. 811, 865-66 (2017). Manipulating a person's future adversely for the general social good is risky and ill-advised in a democratic society such as ours, compared to a totalitarian society that claims the body and soul of each member.

Given the rampant use of illegal guns in this State and the threat they pose to the community, a long sentence might be justifiable to incapacitate this defendant. But, in this connection the court has considered a variety of relevant factors, including defendant's health and his family situation, and expert testimony on the negligible deterrent effect a long sentence would likely have on defendant and the community.

The court finds a sentence of 30 months to be appropriate. Under prevailing prison conditions, a longer term of incarceration would substantially increase the risk that defendant would attempt suicide, be forced to join a gang in prison, and be less likely to rehabilitate, becoming an increased danger to society on release. Added to the prison term will automatically be three years of supervision release by the court's Probation service, with prison if the supervisee violates strict conditions. Real life rather than abstract theory takes precedence in sentencing.

## II.    Facts

### A.    Background of Defendant

Mr. Lawrence is 25 years old. *See* Presentence Investigation Report ("PSR") at ¶ 37. He was raised by his parents in a middle-income household in Brooklyn. *Id.* at ¶ 40. His parents separated in 2005, when his father was deported to Jamaica after a conviction for misusing a social security number. *Id.* at ¶ 37. Before that, his father worked as a music producer. *Id.* at ¶ 40. His mother is employed by the New York City Board of Education as an assistant principal. *Id.* at ¶ 38. Both of his parents are aware of his conviction and remain supportive. *Id.* at ¶¶ 37-38. He has ten paternal half-siblings, ages 16 through 33. *Id.* at ¶ 39. He was not raised with his siblings. *Id.* One of his brothers resides in Jamaica and assists his father. *Id.* Another brother was murdered in Jamaica in 2014. *Id.* A third brother was incarcerated in New York for 13 years for assault in the first degree and criminal possession of a weapon in the first degree; he was released for

12

deportation in May 2016. *Id.* His fourth brother has been incarcerated in Washington, D.C. since 2008 for reasons unknown to defendant. *Id.* His fifth brother resides in Brooklyn and works as a construction laborer. *Id.* His sixth brother resides in Jamaica and is employed by a furniture store. *Id.* His seventh brother resides in Florida and is a high school student. *Id.* One of his sisters resides in the Bronx, and works as a hairdresser. *Id.* Another sister resides in Canada and works as a nurse. *Id.* His third sister is a high school student in the Bronx. *Id.*

Mr. Lawrence has never married. He has three children from two relationships. *Id.* at ¶ 41. He assists both women in raising the children and maintains good relationships with them. *Id.* at ¶¶ 43-44; Hr'g Tr., Dec. 12, 2016, ECF No. 66 ("Dec. 12 Hr'g Tr."), at 15:7-16:20. Neither woman was present at the May 15, 2017 sentencing hearing. Sentencing Hr'g Tr., May 15, 2017 ("May 15 Sent. Hr'g."). He spends time with his children on a regular basis. While he does not provide child support, extended family members provide some financial assistance to the children. PSR at ¶¶ 43-44.

Mr. Lawrence attended high school until the eleventh grade. *Id.* at ¶ 57. He stopped attending and began working when he had his first child. *Id.* While he was incarcerated, he earned his General Educational and Development diploma in 2013 while he was incarcerated. *Id.* at ¶ 56. Occasionally he worked off the books for his uncles, respectively a maintenance director and a plumber. He also worked for a short time as a laborer for a construction company, and as a camp counselor for several months. *Id.* at ¶ 59. He has been unemployed, financially supported by his mother, while on bail. *Id.* at ¶ 58.

B.    State Incarceration

In October 2012, defendant was convicted in State court of attempted criminal possession of a weapon in the second degree. *Id.* at ¶ 28. He had a loaded pistol on his person when he was arrested. *Id.* He was sentenced to one year in custody. *Id.*

In December 2012, while he was at Riker's Island jail, defendant used his bedding in an attempt to hang himself. *Id.* at ¶ 52. He explained that he had had a physical altercation with correction officers. *Id.* According to defendant, he thought he "had been forgotten in solitary confinement" and that he was being harassed by the officers. *Id.* In addition to these reasons for his suicide attempt, defendant explained that his grandmother had just died. *Id.* Defendant feels nervous when he is away from his family for extended periods of time. *Id.*

Following his suicide attempt, Mr. Lawrence was referred for prison mental health counseling and prescribed psychotropic medication. *Id.* His medical records show that he was treated for an adjustment disorder with mixed disturbance of emotions and conduct in bi-weekly sessions and that he was prescribed Remeron, an anti-depressant. *Id.* at Second Addendum to the PSR. He expressed suicidal ideations during multiple medical appointments at Riker's Island. *See* Ct. Ex. 1, Dec. 13, 2016 (Medical Reports).

## C.    Instant Offense

Video footage from a New York City Police Department ("NYPD") camera revealed that on June 12, 2015, Mr. Lawrence illegally fired a handgun into a street in Brooklyn. PSR at ¶ 5. The video dramatically depicts Mr. Lawrence and a friend arriving at the corner of Newkirk Avenue and East 25th Street in Brooklyn, New York (a residential neighborhood with people walking about) in the evening of June 12. Each fired into Newkirk Avenue, a main thoroughfare. *Id.* Multiple muzzle flashes are visible. *Id.* His companion stood in front of Mr. Lawrence as

they were both firing. A shot fired from defendant's gun hit his companion, who had four wounds, three of which were to his left shoulder and one of which was to his left arm. *Id.* at ¶¶ 5-6.

The police recovered six spent .45 millimeter automatic shell casings in the sidewalk of East 25th Street, just north of Newkirk Avenue. *Id.* at ¶ 9. The gun from which they were fired was never recovered by the police.

### D.    Arrest

Mr. Lawrence was arrested by the NYPD on April 6, 2016. *Id.* at ¶ 10. On April 15, he was released on bond with a condition of mandatory home confinement. *Id.* at 1.

### E.    Guilty Plea

On August 24, 2016, defendant pled guilty to a one-count indictment of possession of ammunition in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2), having previously been convicted of a crime punishable by a term of imprisonment exceeding one year. *Id.* at ¶ 1; Guilty Plea Transcript, Aug. 24, 2016, ECF No. 40, ("Pleading Tr."), at 19:2-5.

### F.    Sentencing Hearing

Sentencing hearings were conducted on December 12 and 13, 2016; February 28, 2017; and May 15, 2017. *See* Dec. 12 Hr'g Tr.; Dec. 13, 2016, ECF No. 67 ("Dec. 13 Hr'g Tr."); Feb. 28 Hr'g Tr.; May 15 Sent. Hr'g. They were videotaped to develop an accurate record of the courtroom atmosphere, as well as some of the subtle factors and considerations that a district court must consider in imposing a sentence. *See* 18 U.S.C. § 3553(a); *In re Sentencing*, 219 F.R.D. 262, 264–65 (E.D.N.Y. 2004) (describing the value of video recording for the review of sentences on appeal).

Present at the hearings were defendant and his counsel, prosecutors from the office of the United States Attorney for the Eastern District of New York, a special agent from the Federal

15

Bureau of Investigation ("FBI"), a detective from the NYPD, several representatives from the Probation Department and Pretrial Services, and several friends and family members, including his mother. Dec. 12 Sent. Hr'g; May 15 Sent. Hr'g.

A police detective testified that, based on his experience investigating gangs in Brooklyn, a video the government presented at the hearing served as evidence of defendant's alleged gang membership. Gov't Sent. Mem. Suppl., Dec. 12, 2016, ECF No. 53 ("Gov't Sent. Suppl."); Dec. 13 Sent. Hr'g at 38:6-48:24; *see infra*, section IV.B.3.

## III.    Offense Level, Category, and Sentencing Guidelines Range

Defendant's base offense level is 14, with a criminal history category of II. *See* PSR at ¶¶ 16, 31. The offense level was increased by five points pursuant to U.S.S.G. § 2A2.2(b)(2)(A) because a firearm was discharged and by five points pursuant to U.S.S.G. § 2A2.2(b)(3)(B) because the victim sustained a serious injury. *Id.* at ¶¶ 17-18. The offense level was decreased by three points pursuant to U.S.S.G. § 3E.1.1(a)-(b) for defendant's acceptance of responsibility. *Id.* at ¶¶ 24-25. The total adjusted offense level is 21. *Id.* at ¶ 26. The parties do not object to the Guidelines calculation. *See* Dec. 12 Sent. Hr'g at 9:18-10:8; May 15 Sent. Hr'g. The Guidelines imprisonment range is 41 to 51 months. *See* U.S.S.G. Ch. 5 Pt. A; PSR at ¶ 64.

The offense carried a maximum term of 10 years of imprisonment. 18 U.S.C. § 924(a)(2).

Defendant's counsel sought a sentence of 21 months or less: he also asked the court to take into consideration the eight months he had spent in pre-trial and pre-sentencing home incarceration. *See* Def.'s Sentencing Mem., Dec. 8, 2016, ECF No. 49, at 1-2; May 15 Sent. Hr'g. The government urged a sentence of 120 months' imprisonment, the statutory maximum. *See* Gov't Sentencing Mem., Dec. 9. 2016, ECF No. 50, at 1; May 15 Sent. Hr'g.

The statutory provisions and Guidelines suggest a term of supervised release of not more than three years. 18 U.S.C. § 3583(b)(2); U.S.S.G. § 5D1.2(a)(2). Defendant is ineligible for probation. U.S.S.G. § 5B1.1, comment (n.2).

## IV. Law

### A. Sentencing Commission Guidelines

Pursuant to the Supreme Court's decision in *United States v. Booker*, the Guidelines are advisory; a sentencing court may depart in the interest of justice as well as in light of other statutory concerns as expressed in section 3553(a). *United States v. Booker*, 543 U.S. 220, 245-46 (2005); *see also United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) ("It is now, however, emphatically clear that the Guidelines are guidelines – that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense.").

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). If the sentence is not of the kind prescribed by, or is outside the range of, the Sentencing Guidelines referred to in section 3553(a)(4) of title 18, the court shall indicate the specific reasons for imposing a different sentence. *See* 18 U.S.C. § 3553(c)(2). These "reasons must also be stated with specificity in a statement of reasons form." *Id.* Even though the Guidelines are now advisory rather than mandatory, *Booker*, 543 U.S. at 245-46, the sentencing court must still adhere to the requirements of 18 U.S.C. § 3553(c)(2). *United States v. Jones*, 460 F.3d 191, 197 (2d Cir. 2006). The sentencing court's written statement of reasons shall be "a simple, fact-specific statement explaining why the Guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Rattoballi*, 452 F.3d 127, 138 (2d Cir. 2006),

17

*abrogated in part on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007). The statement should demonstrate that the court "'considered the parties' arguments' and that it has a 'reasoned basis for exercising [its] own legal decisionmaking authority.'" *Cavera*, 550 F.3d at 193 (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)).

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society, and our economy, parsimony in incarceration is prized. *See, e.g.*, 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary."); National Research Council of the National Academies, *The Growth of Incarceration in the United States, Exploring Causes and Consequences*, 8 (2014) ("*Parsimony*: the period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

## B.   Sentencing Considerations

### 1.    18 U.S.C. § 3553(a)

As required by 18 U.S.C. § 3553(a), the court considered the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### 2.    Suicide

Suicide has been the leading cause of death in jails since 2000. *See* Margaret Noonan, Harley Rohoff & Scott Ginder, *Mortality in Local Jails and State Prisons, 2000-2013 – Statistical Tables* (U.S. Dep't of Justice, 2015). In 2013, 34% of all jail inmate deaths were due to suicide, a 14% increase from 2012. *Id.* The rate for suicides in prisons is lower, but staggering. In 2013, 192 inmates in state prison committed suicide, which accounts for 5.5% of all prison deaths that year. *Id.* at 20. "Individuals with mental illness are disproportionately represented in jails and prisons . . . [they] are also disproportionately represented in solitary confinement—accounting for

approximately one-quarter to one-half of individuals in solitary confinement." Melanie Campbell, *Vulnerable and Inadequately Protected: Solitary Confinement, Individuals with Mental Illness, and the Laws that Fail to Protect*, 45 HOFSTRA L. REV. 263, 264-65 (2016) (footnotes omitted).

The court relied on the opinion in *United States v. D.W.*, a recent case that considered the adverse impact a long imprisonment term can have on a defendant who has previously attempted suicide. *See United States v. D.W.*, 198 F. Supp. 3d 18 (E.D.N.Y. 2016); Dec. 13 Sent. Hr'g at 50:7-12.

In *D.W.*, defendant was sentenced to the minimum term of incarceration mandated by statute, but in part due to his past "repeated attempts at taking his own life," the court recommended that defendant serve his sentence at a medical facility that offers specialized treatment and services. *D.W.*, 198 F. Supp. 3d at 147 ("Should this court's recommendations not be followed, defendant may raise a challenge to the constitutionality of the sentence. The sentence relies on the assumption that recommendations will be carried out by the [Federal Bureau of Prisons ("BOP")].").

The court closely considered the effects the BOP's use of solitary confinement has on inmates, and observed that "time served in solitary confinement can lead to serious mental illness in healthy individuals. It significantly exacerbates the condition of those already suffering from emotional instabilities." *Id.* at 91; *see also* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J.L. & POL'Y 325, 333-38 (2006) (discussing the various adverse effects of solitary confinement on an individual); Alex Kozinski, *Worse than Death*, 125 Yale L.J.F. 230 (2016) (describing the conditions of solitary confinement and the need for reform); Reginald Dwayne Betts, *Only Once I Thought About Suicide*, 125 Yale L. J. F. 222 (2016) (giving a personal account of the adverse effects of solitary confinement); THE LIMAN PROGRAM, YALE LAW SCHOOL & ASSOCIATION OF STATE CORRECTIONAL ADMINISTRATORS, TIME-IN-CELL: THE ASCA-LIMAN

2014 NATIONAL SURVEY OF ADMINISTRATIVE SEGREGATION IN PRISON 3 (2015) (estimating that between 80,000 and 100,000 people were in isolation in prisons in 2014).

In sentencing D.W., the court took into account his mental illness, including his previous suicide attempts, as a characteristic rendering him highly vulnerable during incarceration. *D.W.*, 198 F. Supp. 3d at 66-74. "In the last few years, legislation in some jurisdictions, class action settlements, and policies in the federal prison system and in some states have prohibited or limited correctional facilities' authority to put seriously mental ill individuals in restrictive housing." ASSOCIATION OF STATE CORRECTIONAL ADMINISTRATORS & THE ARTHUR LIMAN PUBLIC INTEREST PROGRAM, YALE LAW SCHOOL, AIMING TO REDUCE TIME-IN-CELL: REPORTS FROM CORRECTIONAL SYSTEMS ON THE NUMBERS OF PRISONERS IN RESTRICTED HOUSING AND ON THE POTENTIAL OF POLICY CHANGES TO BRING ABOUT REFORMS 48 (2016) (footnotes omitted). "The Department of Justice has similarly altered its standards to make it clear that seriously mental ill individuals should not generally be placed in restricted housing." *Id.* (footnote omitted); *see also* Abigail Q. Cooper, *Beyond the Reach of the Constitution: A New Approach to Juvenile Solitary Confinement Reform*, 50 COLUM. J. L. & SOC. PROBS. 343 (2017) (advocating for reform to the practice of solitary confinement on the state level by Attorneys General).

Defendant in the present case has, as already noted, previously attempted suicide while incarcerated and has suffered extreme distress when he is away from his family for extended periods of time. PSR at ¶ 52. Inmates with mental illness are frequently placed in solitary confinement, both to punish them if their behavior does not conform to prison policies and to protect them if they are vulnerable and pose a risk to themselves or others. *See D.W.*, 198 F. Supp. 3d at 74-76. "Reliable studies show that inmates with pre-existing mental illnesses are likely to suffer the most severe consequences from isolation," and "[t]he effects of solitary confinement do

not end when an individual is released. The harm caused is likely to translate into greater risks for the public when a former inmate is unable to reenter his or her community even somewhat rehabilitated—the lasting consequence of prolonged isolation." *Id.* at 93-94. *See also* The Editorial Board, *Mental Illness, Untreated Behind Bars*, N.Y. TIMES, Feb. 27, 2017, https://www.nytimes.com/2017/02/27/opinion/mental-illness-untreated-behind-bars.html?_r=0 (noting that during a White House meeting in February, President Trump stated "prison should not be a substitute for treatment").

Given defendant Lawrence's mental health and altercations with New York State correction officers, it is likely that he will be placed in solitary confinement while serving the instant sentence. Solitary confinement – and a long imprisonment – will neither provide significant specific nor general deterrence. It will harm Mr. Lawrence's mental health. It is likely to increase dangers to the community upon defendant's release.

"The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison. . . . the prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian as well as a compassionate exercise." *D.W.*, 198 F. Supp. 3d at 23.

### 3. Gang Membership

The government attempted to prove that defendant is affiliated with several Canarsie-based gangs that have an ongoing feud with Folk Nation, a gang that considers the area in which the instant shooting occurred its territory. *See* Gov't Sent. Mem., Dec. 9, 2016, ECF No. 50 ("Gov't Sent. Mem."), at 4 n.3; Gov't Sent. Suppl. The government presented a video that defendant had posted to his Instagram account while he was on pretrial release as evidence of his alleged gang activity. Gov't Sent. Suppl. It shows defendant narrating his activity as he walks through an area

of Brooklyn and into a store. *Id.* A City detective testified at the sentencing hearing that in his experience as a gang investigator, he believes the video is evidence of defendant's gang involvement. Dec. 13 Sent. Hr'g at 38:6-43:24. According to the detective, the video depicts defendant walking on rival gang territory, searching for and antagonizing a rival gang member. *Id.* at 40:21-43:22. The government contends that the video is proof of Mr. Lawrence's gang activity and provides context for his activities on June 12, 2015, where he and his co-conspirator were shooting on rival gang territory to antagonize members of another gang. *See* Gov't Suppl. Mem.; Dec. 13 Sent. Hr'g at 47:3-8. The video provided insufficient proof that Mr. Lawrence is associated with a gang and that the shooting occurred as part of gang activity. Dec. 13 Sent. Hr'g at 46:19-47:13.

The detective also examined Mr. Lawrence's tattoos at the hearing. But he was unable to conclude that any of defendant's tattoos indicated gang affiliation. *Id.* at 45:15-46:18.

Defendant's alleged gang affiliation did not factor into the court's sentence, because evidence of gang membership was not proven. Nevertheless, the court finds that defendant is at risk of becoming a gang member while in prison. As the court observed from the video footage, defendant fired shots on a public street of a residential neighborhood. Gov't Sent. Mem. at Ex. A. The footage depicts residents' reactions to the sound of shots being fired; several began running towards a residential building seeking safety when they heard gun shots. *Id.* Firing shots repeatedly into a residential street for no apparent reason and accidentally shooting an acquaintance in the process is a particularly severe example of current gun violence.

Although shootings in New York City in 2016 fell to the lowest level in more than 20 years, they remain a severe threat to public safety. Ashley Southall, *Shootings in New York Fell in 2016 to Lowest Level in More Than 20 Years*, N.Y. TIMES, Jan. 5, 2017, at A21 (998 shootings in 2016;

1,138 in in 2015; up to 5,000 per year in the 1990s). The police attributed much of "the decline in shooting to the Police Department's focus on the gangs and crews that . . . are driving much of the violence." *Id.*

The threat of guns remains acute. Courts must consider coordinating their work with that of other agencies attempting to prevent the possession of guns and shootings in New York City. *See id.* ("[T]hey are receiving longer sentences when convicted."); *see also id.* ("[T]he number of shootings tied to gangs . . . dropped to 417 last year, from 565 in 2015."); Benjamin Mueller & Al Baker, *Steep Drop in Gang Violence Pushed City Shootings Below 1,000 in 2016*, N.Y. TIMES, Jan. 4, 2017, at A17 ("By going after the gang members, arresting them, we recognize the resultant reduction in violence."); Benjamin Mueller, Noah Remnick & Al Baker, *As Nationwide Gangs Fracture, Bullets Fly in New York*, N.Y. TIMES, May 15, 2017, https://www.nytimes.com/2017/05/15/nyregion/bronx-gang-violence-murders.html ("Gangs are not as top-down and regimented as they once were, or unified any longer by a vision of racial solidarity and rivalries with opposing gangs. Rather, the Bloods are fighting increasingly among themselves, sometimes to fill leadership vacuums as older leaders are locked up through federal prosecutions. As a result, sets — subgroups of national gangs — are splitting up and losing influence to separate, younger crews more loyal to their local housing projects.").

## V. Conclusion

Defendant has had difficulty leading a law-abiding life. He was convicted in State court for an attempted possession of a weapon (he actually possessed a loaded handgun) in 2012. PSR ¶ at 28. In 2012 and 2014, respectively, he was convicted of aggravated unlicensed operation of a motor vehicle. *Id.* at ¶¶ 29-30. In 2014, he was found in possession of several fraudulent bank

cards. *Id.* at ¶ 30. In June 2016, while on home detention, he tested positive for marijuana. *Id.* at ¶ 3.

Mr. Lawrence says he is eager to turn his life around and dedicate himself to being a good father to his three young children. He has expressed remorse for his conduct and understands the gravity of his actions. All relevant elements of the Guidelines and statutes have been considered.

A sentence of 120 months recommended by the government would be greater than is required to protect the public or to assist defendant in rehabilitation.

In light of the nature of the offense and the characteristics of defendant, he is sentenced to 30 months in prison, 3 years of supervised release, and no fine in light of his inability to pay one. *See* May 15 Sent. Hr'g; PSR at ¶¶ 61-62. A $100 special assessment is imposed. 18 U.S.C. § 3013; May 15 Sent. Hr'g.

Should recidivism be a problem while defendant is on supervised release, the court has the power to impose further incarceration. Because the sentence imposed falls 11 months short of the minimum of 41 months recommended by the Guidelines, the court noted on the record that its presumptive sentence for a serious violation of supervised release would be at least 11 months of incarceration. May 15 Sent. Hr'g. This prospective penalty should have a deterrent effect on defendant's post-release conduct.

Respectful consideration was given to the Sentencing Commission's policy statements, and all other factors listed under section 3553(a) of title 18. The sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).

## VI. Recommendation to Sentencing Commission on Gang Membership

The Guidelines do not consider gang membership as a factor in sentencing, except for defendants who are sentenced under 18 U.S.C. § 521 (pertaining to criminal street gangs), where

the Guidelines provide for an upward departure. U.S.S.G. § 5K2.18. Were gang membership a sentencing factor in cases other than those under 18 U.S.C. § 521, courts would give greater weight to this factor. This court recommends that the Sentencing Commission revisit the gang membership problem.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date: May 23, 2017
Brooklyn, New York